# Parsley et al. v. Parsley et al.

(Decided February 14, 1930.)

B. F. DENHAM for appellants.

HEBRON LAWRENCE and J. C. CARTER for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Reversing.

John B. Parsley and his wife, Cansadie Parsley, executed to J. I. Parsley (hereinafter called "Ike") three deeds, and, after the death of old man John, these were attacked for fraud, duress, undue influence, lack of mental capacity upon the part of old man John, etc.; two of them were canceled by the trial court, and from that judgment Ike has appealed.

The record shows John B. Parsley was suffering from tuberculosis, and probably from another ailment even more horrible and quite as communicable. Weakening from the ravages of these diseases, and giving down under the weight of accumulating years, the old man gradually became more and more helpless.

The old man had a farm, referred to in this record as "The Home Place." How large this was and its value nowhere appears. He also had three other small tracts of land which are the bones of contention in this controversy.

One by one the old man's children had left him. He sent for Ike, and had Ike move into a tenant house on his place, and cultivate his farm for him and help him look after him. He continued to fail, and finally he and his wife moved into the house with Ike, and, while he was there, he made Ike three deeds, to cancel which this suit was begun.

Deed No. 1 was executed September 20, 1926; by it there was conveyed to Ike 20 acres of land worth about $400, and in it there is this:

"For and in consideration of the fact that the said J. B. Parsley is now sick and in a helpless condition, and

the said J. I. Parsley has this day taken the said first parties into his house to care for them, whilst J. B. Parsley lives, . . . J. I. Parsley is to keep said J. B. Parsley and his wife, Cansadie A. Parsley, in the house with him, while the said J. B. Parsley lives, and is to take the best of care of the said J. B. Parsley, he can while he lives, and at his death this deed shall be in full force and effect, and if the said J. I. Parsley should fail to take care of the said J. B. Parsley, as best he can until his death, this deed, shall be null and void. The said J. I. Parsley is not bound in this deed to pay for medicine, or medical treatment, neither to pay any burial or funeral expenses, and is only to keep the said Cansadie Parsley until the death of her husband, J. B. Parsley.''

Seventeen days thereafter old man John made deeds Nos. 2 and 3. The evidence is that, when deeds 2 and 3 were written, old man John said:

''If it had not been for Ike he would have lain there and died; that he made the second deed to Ike to pay him for what he had already done for him; that the first deed he had made was not enough and he wanted to pay him more; that he was going to die; that Ike needed some pasture land and he wanted his wife cared for.''

Deed No. 2 was executed on October 7, 1926; by it old man John and his wife conveyed to Ike six acres of land worth $275, and said in it:

''In consideration of Fifty Dollars, cash paid by taking care of me during my sickness, until Sept. 20, 1926.''

On that same day these old people made Ike deed No. 3 for 15 acres of land, and said in this deed:

''For and in consideration of the sum of One Hundred Dollars, cash. . . . It is understood in this deed that Cansadie A. Parsley is to have rent off of this land while she lives.''

This 15 acres is worth about $600, and, as Mrs. Parsley was then 63 years old, and Ike must pay her rent on this while she lives, the net value of this land to Ike is about $340, so that by these three deeds Ike got about $915 for keeping these old people while old man John lived.

The old man had born to him six children, one of whom had died, leaving two boys, and this suit to cancel these deeds was begun by one of his sons and these two boys on August 11, 1927. The other children refused to join in it, and they and Ike were made defendants. Can-

sadie Parsley had by deed No. 3 acquired the right to collect rent from tract No. 3 while she lived, but she was not made a party. Ike answered, and denied all of the allegations of the petition. One of these defendants did not answer, and the other two answered and joined in the prayer of Ike's answer. No one fixes the date of old man John's death closer than to say he died in the summer of 1927.

They say the old man had crazy spells or mad spells. There is, however, no evidence that these were other than mere exhibitions of bad temper. The old man would get into a rage, and, while he was raging, he would say and do unreasonable things; that, however, was temporary, and is something from which but few of the human family are entirely free.

The old man had a little grist mill driven by water power, and some of the witnesses tell of seeing him wading in the creek above his mill cleaning out the creek during freezing weather some years before making these deeds, and therefore they say he is crazy. Many men carry their habits of industry to such extent that others regard them as crazy, but it is such men that keep the wheels of industry going. There are many human occupations fraught with such hardship and dangers that it is not unusual to hear it said of men who engage in them that they are crazy; for example, structural steel workers, divers, powder mill employees, etc. Yet all know such men are not of unsound mind. To show the utter foolishness of cleaning out the creek at that time, it is shown that then the old man's mill had been so damaged by a flood he could not use it. That may be true; still the old man may have hoped to repair it. It has been said that hope is the last thing that dies in man. Hope —of all ills that men endure, the only cheap and universal cure; the captive's freedom, and the sick man's health, the lover's victory, and the beggar's wealth.

Another bit of evidence upon which the plaintiffs place great stress is that, after executing deeds 2 and 3, the old man turned his face to the wall and cried. We do not see this as the plaintiffs do. They regard this as evidence that the old man was under duress; to us it seems rather evidence of lost hope of recovery, and to have been caused by a consciousness that death was waiting in the offing. There are but few of us so stoical that we can contemplate approaching dissolution unmoved and unafraid.

A short time after these deeds were made, the old man said to several of his visitors that surely he was not in his right mind when he did it, or he would not have made them. The plaintiffs place great reliance on that remark. Waiving all question of its admissibility, it amounted to nothing. The doors of the courthouse were wide open, the making of these deeds was a matter of common knowledge in the neighborhood, yet, though the old man lived for several months thereafter, he did not, nor did the plaintiffs while he lived, seek to have them canceled, or object in any way.

We are not impressed by the evidence of many of the witnesses that the old man's mind was gone, because they were forced on cross-examination to admit that, after these deeds were made, one leased the old man's home from him, one built a barn for him, one bought a cow from him, one bought a wagon, one bought his timber, etc. According to them, the old man was perfectly able to contract with any one except Ike.

This case is strikingly like Hall v. Drake, 232 Ky. 127, 22 S. W. (2d) 568, and Petty v. Pace, 207 Ky. 592, 269 S. W. 713. In the Petty case we said:

"However, Mrs. Rickman was confronted by a condition, and not a theory. She was old, lonely, and dependent. Those who should have been prompted by ties of consanguinity to nurture and care for her showed no such disposition. She had this property, worth probably $6,000, and if by the use of that she was able to provide herself with needed care and attention in her declining years, such an arrangement we should not hastily set aside. To do so would be equivalent to denying to the aged and infirm the right to use their property to procure for themselves that care and attention of which they then so sorely stand in need."

"Our foresight is never as good as our hindsight" is a homely expression of a great truth. When this old man lay ill at Ike's, no one could tell how long he would live or whether Ike had a good bargain or not, so plaintiffs took no steps then to cancel these deeds, but, now that the old man is dead, they look back on it all, and, with the extent of Ike's bargain definitely known, they hasten to invoke the aid of the chancellor. We are not impressed by the case they have made.

The judgment is reversed, with directions to dismiss the petition.