## Clark, et al. v. Young's Extx.

(Decided January 23, 1912.)

### Appeal from Jefferson Circuit Court
### (Common Pleas Branch, First Division.)

1. Will—Contest—Evidence—Inequality.—Mere inequality in a will is not sufficient to impose upon the propounders the burden of proof.
2. Same—Evidence—Peremptory Instruction.—In a will contest, evidence examined and held insufficient to take the case to the jury.

O'DOHERTY & YONTS for appellants.

KOHN, BAIRD SLOSS & KOHN for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

Phillip Young, a resident of Jefferson County, Kentucky, died in January, 1905. By his will which was executed July 13, 1901, and which was duly probated by the County Court, he devised all his property to his wife. His property consisted of a house and lot worth from $3,000 to $3,500, a vacant lot worth $1,350 and $2,000 in cash. After the payment of his debts the property amounted to about $6,000. In addition to this, he had his life insured in favor of his wife. Upon this policy she collected about $3,800, which sum is not involved in this controversy. Just before the expiration of five years after the death of the testator, his children born of his first wife, instituted this proceeding contesting his will. At the conclusion of the evidence for the contestants, the court directed a verdict sustaining the will. Judgment was entered accordingly, and the contestants appeal.

Phillip Young was married three times. His first wife, the mother of appellants, died in 1895. He married his second wife in 1896. He secured a divorce from her on December 28, 1901, and eleven days later, married his third wife, his sole devisee and the propounder of the will in question.

The execution of the will was proven by T. W. Spindle, an attorney at law, who stated that the testator came to his office and said that he wanted to leave all his property to his wife, and asked him to put it in shape for him. He then drew the will, which was attested by him and Mr.

Baird in the presence of each other and of the testator and at the latter's request. The will was then offered in evidence and read to the jury. Thereupon the propounders rested. The contestants then asked for a peremptory instruction directing the jury to find a verdict for them. The motion was overruled.

The contestants then introduced their testimony. Dr. Brzozowski testified that he visited and treated the testator for cirrhosis of the liver, and obtained from him a history of his physical condition. The testator told him that a physician had advised him that he had the syphilis. Witness examined him, but could find no signs of it, but did find signs of cirrhosis of the liver, which had a tendency to excite nervousness and sleeplessness, and to make the patient morose and gloomy. Upon cross-examination, witness stated that testator whom he visited for six or seven months about the year 1903, was a man of fine sense and discretion, and capable of transacting business and making a will. "He was a very strong minded man; whatever he said had to go through." He appeared to be devoted to his children and to his wife.

Dr. Robert G. Fallis testified that he knew the testator and treated him for stomach trouble. Testator told him he had the syphilis. Witness saw no signs of it, though he made no special examination for the purpose of determining whether or not testator had syphilis. If a man had the syphilis, it was apt to bring about a nervous condition in some of the organs of the body. Witness also stated that cirrhosis of the liver had a tendency to make a man gloomy, but not to render a man's mind abnormal except in the last stages of the disease. On cross-examination, witness stated that the testator was a man of intelligence, and able to transact business, and knew exactly what he was doing . Witness never saw him otherwise. Witness also stated that testator liked to have his own way about things.

Dr. H. J. Phillips testified that he treated testator from June, 1904, until January, 1905. Testator was suffering with Bright's disease. A man suffering from that disease, may be normal mentally. After the disease progresses to a certain stage, he may not be. Witness regard testator's mental condition as good, and that up until about November, 1904, he was capable of transacting business, and of making a will and disposing of his property according to a fixed purpose of his own.

John Hawkes testified that he knew the testator and

saw him frequently before his death. Hardly thought he was a man of sufficient mind to know his estate, and his kindred and those having natural claims upon his bounty, and to make a will disposing of his property according to a fixed purpose of his own, "from reasons only." He then stated, "My reasons, if it can be stated before the court, would be on account of his children." Thought testator was a man who could be easily influenced by a woman, because "he seemed to have a regard for women and he never spoke any way disrespectful or anything like that." Could not say that his third wife had any special influence over him. On cross-examination, witness stated that testator was a man of intelligence, and knew what he was doing at all times, except "in this single case." By this he meant the testator did differently from what he would have done.

Appellant, Martha Young Clark, testified that she was twenty-four years old, and that her mother had been dead fifteen years. Her father had by her mother five children, three of whom were dead, leaving herself and a younger sister who was feeble-minded, to whom her father was devoted. About four months after her father's marriage to appellee, her younger sister was taken to the Feeble-Minded Institute at Frankfort. At that time she and her sister were both at the Sacred Heart Academy, and appellee suggested that her sister go to Frankfort, as that was the best place for her. When witness was nine years old, and before her mother died, she saw her father riding with appellee in a buggy. Appellee told witness that she and her father had agreed to marry before her father was divorced from his second wife. Upon one occasion she asked her father what kind of a will he was going to make. Her father said, "Girlie, I won't tell you." Whereupon, appellee said, "You will be surprised, or in other words, you will open your eyes when your father dies." Appellee had influence over her father because he forgot his obligations to his children. Witness wanted to finish her education in music in Cincinnati. Appellee objected, and her objection prevailed. She then continued her music lessons in Louisville. Her father received $5,000 from her grandmother's estate, which he lost in a hotel venture in Pennsylvania. She lived with appellee for about four years after her father's death, when she married an elderly man who had two children, and all of them moved to appellee's home and lived with her. Soon appellee

moved out. Her belief that appellee had influence over her father was based on the fact that she persuaded her father to send her younger sister to the Feeble-Minded Institute, and not to permit witness to finish her musical education in Cincinnati. On cross-examination, appellant testified that her father was intelligent, of fine physique, and a strong-minded man.

Katie Wernz, a trained nurse, said that she did not believe testator had good mind, because he was sick and had had several operations performed on him, and because of his treatment of his children. She believed appellee had influence over testator, because of the fact that he sent the feeble-minded child away, and refused to permit his other child to go to Cincinnati to finish her musical education. She also stated that testator had admitted to her brother that he had a loathsome disease.

Dr. W. C. Dugan testified that he operated on testator in 1894 or 1895 for hernia; that cirrhosis of the liver and Bright's Disease might have a tendency to effect the mind; and that syphilis might effect the higher senses. Witness admitted that when he examined testator he found no evidence of syphilis, and also stated that at the time testator was a perfectly rational and intelligent man.

Dr. Carl Widener, who assisted Dr. Dugan in the operation for hernia, stated that if a man were afflicted with cirrhosis of the liver, Bright's Disease and syphilis, it would have a tendency ultimately to impair his mind. Upon cross-examination, he stated that when he examined testator, he saw no indications of such disease. When he attended testator, testator was a man of good mind and able to attend to business.

The court did not err in refusing a peremptory instruction in favor of contestants when the propounders rested after proving the attestation of the will and introducing it in evidence. The fact that the will on its face shows an unequal distribution of the estate, or that one devisee or legatee was given more than another one, does not make it incumbent upon the propounders to explain the apparent inequality, until after the introduction of other evidence by the contestants tending to show incapacity or undue influence (Bottom v. Bottom, 32 Ky., 494 ———; Childers v. Cartwright, 136 Ky., 498; Watson v. Watson, 137 Ky., 25.) It would be a strange law that gave to a man the power to make a will and dispose of his property as he saw fit, and at the same time couple

with it the limitation that if any inequality appears on the face of the will, this of itself is sufficient to create the presumption of incapacity or undue influence.

But it is insisted that the fact that the testator gave his estate to his wife to the exclusion of his own children, coupled with the evidence introduced by the contestants, is sufficient to take the case to the jury. An examination of the evidence hereinbefore set out will show that while the physicians testified that a man might have a disease and that disease might impair his mind, no such condition appeared so far as the testator was concerned but on the contrary he was a man of fine intelligence and great strength of mind. Indeed this is admitted by appellant, Martha Young Clark. Hawkes' opinion of the testamentary capacity of the testator was based solely on the fact that he devised his property to his widow to the exclusion of his children. Miss Wernz bases her opinion on the same fact, and the further fact that the testator was a sick man. Her opinion that he was subject to undue influence by appellee is based on the fact that he at her suggestion sent his feeble-minded child who was then at an academy in Louisville to the Feeble-minded Institute at Frankfort, and also upon the advice of his wife, concluded that it was not best to send the older daughter to Cincinnati to study music, but to let her remain in Louisville and receive private instruction in music there. This advice was given two years after the will was made. That a father may think it best to transfer a feeble-minded child from one institution not specially provided with facilities for instructing the child to another created and maintained by the State for educating children so afflicted, is not in our opinion evidence of undue influence on the part of the person who suggests the propriety of such action. Nor can a father be said to be the subject of undue influence for yielding to the suggestion that his young daughter be kept at home and instructed in music by a teacher in a large city like Louisville in preference to sending her to Cincinnati for that purpose. Here then we have a case predicated on opinions based either on the inequality of the will, or the two circumstances above referred to. As neither the inequality of the will nor the circumstances referred are sufficient to show undue influence or mental incapacity, it follows that opinions based thereon are likewise insufficient for that purpose. (Smith v. Commonwealth, 129 Ky., 433; Sanders v. Blakely, 21 Ky. Law Rep., 1321;

Bush v. Lisle, 89 Ky., 393.) Nor does this conclusion conflict with the scintilla rule, for that rule requires some evidence even though it be slight; and by evidence is meant something of substance and relevant consequence, and not vague, uncertain or irrelevant matter not carrying the quality of proof, or having fitness to induce conviction. (Minnehan v. Grand Trunk, 138 Fed., 37.)

Judgment affirmed.